UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GAYLE MCKENNON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 05-CV-11416 |
| | ) | |
| ARTEES ISLAND DESIGNS, LLC, | ) | |
| Defendant | ) | |
| | ) | |

ARTEES ISLAND DESIGNS, LLC OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

Defendant, arTees Island Designs, LLC, opposes Plaintiff Gayle McKennon's

motion for a preliminary injunction under Fed. R. Civ. P. 65(a) and Ms. McKennon's

request for the impoundment of the original artwork entitled "Rhododendron" and

"Clownfish" and for the impoundment of garments incorporating those designs under

Fed. R. Civ. P. 65(f). In support of its opposition, arTees submits the following

Memorandum of Reasons, and two attached Affidavits.

DEFENDANT'S MEMORANDUM OF REASONS TO DENY PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND IMPOUNDMENT OF
ORIGINAL ARTWORK AND GARMENTS.

<u>INTRODUCTION</u>

Defendant arTees Island Designs, LLC ("arTees") is in the business of screen

printing and embroidery. arTees engaged Plaintiff, Ms. Gayle McKennon, among others,

to provide artwork for its use. With few exceptions not relevant to the instant motion,

1

arTees commissioned Ms. McKennon to paint certain designs, including the two at issue, pursuant to an oral agreement between the parties. Following an iterative and collaborative design process, Ms. McKennon painted each design to arTees' specifications. Upon delivery of each acceptable painting, arTees paid Ms. McKennon a lump sum, pursuant to their oral agreement, as payment in full for (1) the purchase of the original artwork, and (2) a perpetual, paid-up, royalty-free license to use the artwork in its business.

Because Ms. McKennon sold the two pieces of original artwork to arTees, she is not entitled to impoundment of the paintings. Because arTees has a claim under the Works Made for Hire and Joint Authorship doctrines to both the original artwork and to the derivatives it prepared in modifying and processing the artwork for application to garments, Ms. McKennon is entitled neither to impoundment of any garments nor to an injunction preventing arTees from using the designs. Finally, independent of the preceding, because arTees purchased from Ms. McKennon a perpetual, royalty-free license to use in its business each piece of artwork at issue, and because Ms. McKennon's attempt to terminate those licenses was improper and ineffective, arTees has valid license to use the works. Accordingly, arTees respectfully requests the denial of Ms. McKennon's requests for preliminary injunction and impoundment.

## FACTS

Defendant arTees Island Designs, LLC is a Massachusetts Domestic Limited Liability Company organized on November 6, 2000, with a principal place of business at 58A Plant Road, Hyannis, MA. arTees is in the business of designing and manufacturing

high-end custom screen printing and embroidery, specializing in producing "Art you can wear." SHG Aff., ¶ 3.[1]

arTees began doing business with Ms. McKennon in early 2001 under an oral agreement whereby Ms. McKennon agreed to provide arTees with paintings and arTees agreed to purchase from Ms. McKennon (1) the original paintings it commissioned and (2) the right to use the images embodied in those paintings in its business. SHG Aff. ¶¶ 4-5. The only exception to arTees purchasing the originals occurred in that minority of instances when Ms. McKennon provided previously completed works she had painted or sketched independently; when that occurred, arTees reduced the price it paid, purchased only the rights to use those images in its business, and returned the originals after scanning and digitizing them. SHG Aff. ¶¶ 5, 7, 12. Between 2001 and June, 2004, this relationship resulted in arTees acquiring ownership of approximately forty-two original commissioned paintings and various sketches made by Ms. McKennon, and acquiring the rights to use approximately forty-three paintings and various sketches made by Ms. McKennon. LAG Aff. ¶ 18.

For the vast majority of these pieces, including the two at issue, Rhododendron and Clownfish, arTees commissioned Ms. McKennon to paint these specific designs; provided her with reference material, such as books arTees either purchased or borrowed from local libraries, and artwork found on the Internet; reviewed and modified preliminary sketches; dictated the creative selection of expressive characteristics such as

---

[1] Two affidavits are submitted with this opposition memorandum: Affidavit of Stephen H. Gayner and Affidavit of Leslie A. Gayner. They will be referred to as "SHG Aff." and "LAG Aff.," respectively. Two Plaintiff exhibits are also referred to in this memorandum as follows: Affidavit of Gayle McKennon, referred to as "McKennon Aff."; and the letter from Ms. McKennon dated December 23, 2004 provided as Plaintiff Exhibit 5, referred to herein as "12/23/04 Letter."

color choice, the number, size, pose, orientation, and arrangement of foreground and

background elements, and the dimensions and geometry of the painting; and made other

creative and artistic contributions.  The process of arriving at the final design was

collaborative and iterative, and involved the exchange and review of preliminary

sketches, rejection of certain ideas by arTees, modification of Ms. McKennon's proposals

by arTees' artistic staff, and final approval of both the final drawings and the final

paintings by arTees.  SHG Aff. ¶¶ 8-9; LAG Aff. 1-9.  Ms. McKennon had no choice but

to incorporate the creative elements dictated by arTees into each painting.

   Once Ms. McKennon provided a final painting acceptable to arTees, arTees paid

Ms. McKennon the agreed-upon consideration for the purchase of the original

commissioned piece and for the rights to use the piece in its business.  SHG Aff.  ¶¶ 11,

13.  For the Rhododendron painting, arTees paid the negotiated price of $300.00 on July

23, 2002; for Clownfish, $300.00 on December 15, 2003.  Between 2001 and 2004,

arTees paid Ms. McKennon over $10,000.00 to purchase outright some forty-two original

paintings and various sketches, and to purchase the rights to use some forty-three

paintings and various sketches.  LAG Aff. ¶ 18.

   With its one-time payment, in addition to the purchase of the original artwork in

most instances, including the two pieces at issue, arTees purchased from Ms. McKennon

for each piece of artwork a license to use that artwork in its business, including the right

to make derivative works from the artwork (such by as adding the name of the client

museum, arboretum, or aquarium; removing and rearranging elements; retouching and

cleaning up the images following digitizing and prior to producing films and screens for

printing; and changing colors, as non-exhaustive examples), to make and sell items

displaying the designs and derivatives thereof, and to use and display the artwork and derivatives on its website, at trade shows, and for other promotional purposes. The license grants were fully paid-up with the single payment. The license grants were royalty-free. The license grants were also perpetual. SHG Aff. ¶ 5; LAG Aff. ¶ 10.

An exception to this business arrangement is illustrative of the course of dealing between the parties. In May, 2003, Ms. McKennon presented arTees with a painting entitled "Fading Sailboat" that she had made previously and not on commission from arTees. arTees found the painting interesting and an oral agreement different from the others was made. arTees agreed to pay Ms. McKennon $100.00 for the rights to use the image, agreed that it was not purchasing the original, and agreed to return the original to Ms. McKennon once it had been scanned and digitally processed. arTees paid $100.00 to Ms. McKennon, and, following scanning and processing, arTees returned the original. Id. ¶¶ 5, 7, 12.

The week of June 13, 2004, Ms. McKennon requested that arTees allow her to take her original artwork for display at an art show. Id. ¶ 16. In a conversation Friday, June 18, 2004, arTees expressed reluctance based on some previous experiences when it loaned purchased artwork back to other artists and it was damaged, destroyed, or never returned. Ms. McKennon then claimed for the first time that the agreement between the parties was that arTees purchased the right to use the artwork in its business, but that Ms. McKennon retained ownership of the originals. arTees disagreed and stated that the agreement included the outright purchase of the originals, as well as the rights. Id. ¶ 17.

Ms. McKennon delivered a painting to arTees Saturday June 19, 2004. When Mrs. Gayner, another arTees principal, was paying Ms. McKennon for that piece, Ms.

McKennon again raised the issue of access to her original artwork.  Mrs. Gayner explained that arTees had paid Ms. McKennon a premium price (relative to other artists arTees worked with) because the artwork remained under arTees' exclusive control and because the payments included not only the rights to use the artwork but also the originals.  LAG Aff. ¶¶ 15, 16, 19-22.

Ms. McKennon then argued that arTees was only holding the original artwork until such time as she had a place to store it.  arTees disagreed and restated that it bought her artwork on the basis of a single payment for the outright purchase of both the originals and the right to use the designs in its business.  Id. 19-22.

For nearly all the time arTees did business with Ms McKennon and until just before this dispute started with Ms. McKennon claiming arTees was holding the originals pending the artist having storage capability, arTees possessed no special facilities for safeguarding or storing artwork, and kept art in piles in boxes, drawers, and on shelves.  SHG Aff. ¶ 16; LAG Aff. ¶ 23.  arTees never boasted museum quality storage for its artwork and accepts a certain level of risk of damage as a result.  LAG Aff. ¶ 24.

By letter dated December 23, 2004, Ms. McKennon, through her attorneys, stated that she was terminating the "implied license to use her artwork."  12/23/04 Letter, p. 2.  The letter also stated that Ms. McKennon "terminates ArTees [sic] rights to make and sell any garments that incorporate Ms. McKennon's artwork, including derivative works."  Id.  The letter further demanded that arTees immediately cease producing garments incorporating Ms. McKennon's artwork, allowing ninety days to sell existing stock.  The letter did not inform arTees that it was no longer allowed to display the artwork on its web site for promotional purposes.  12/23/04 Letter, p. 2.

The next paragraph stated the legal conclusion of Ms. McKennon's counsel that "Any further use of the Artwork, or manufacture or sale of items, including garments, incorporating Ms. McKennon's Artwork, beyond the scope of the above notice infringes Ms. McKennon's copyrights in her Artwork and will subject ArTees to penalties under 17 USC §§501-505." Id.

arTees has applied designs based on Ms. McKennon's artwork to no garments since receiving the letter dated December 23, 2004, and has neither sold nor offered for sale any items incorporating such designs since March 22, 2005. LAG ¶ 19. Because arTees prints to order, arTees also has no inventory of garments bearing designs derived from Ms. McKennon's artwork. SHG Aff. ¶ 21.

Prior to its overhaul earlier this month, the arTees web site included, among other images which demonstrated the work of which arTees is capable, images of the final design arTees crafted from the Rhododendron and Clownfish paintings. However, these derivative works were displayed as examples of arTees' capabilities, and they were not available for purchase. SHG ¶ 22. No designs based on Ms. McKennon's artwork are present on the current arTees web site. http://www.artees.biz/, last visited July 20, 2005.

## LEGAL STANDARDS

### Copyright Infringement

To prevail on a claim of copyright infringement, the claimant must prove ownership of a valid copyright and the unauthorized copying of the protected work by the alleged infringer. Concrete Machinery Co., Inc., v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 605 (1st Cir, 1988).

### Copyright Ownership

Copyright ownership vests initially in the author or authors; authors of joint works are co-owners of the copyright. 17 U.S.C. § 201(a). Generally, the author is the party who actually creates the work, translating an idea into a fixed, tangible expression. Ownership of the copyright for works made for hire (also called works for hire) vests vicariously in the employer or other party for whom the work was prepared. Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (hereinafter CCNV-II). The Court in CCNV-II resolved a split among the circuits by affirming the literal interpretation of the work for hire doctrine made by the D.C. Circuit and clearly stating that 17 U.S.C. § 102(1) covers only employees as determined by agency law analysis, and that works by independent contractors are works for hire only in specific situations enumerated in § 102(2), including the statute of frauds provision. Id. at 751-2.

However, the Court also approved the D.C. Circuit Court's statement that the commissioning party may become a joint author with an independent contractor by satisfying the requirements of the definition for a "joint work" in 17 U.S.C. § 101. Section 201(a) of the Copyright Act provides that "the authors of a joint work are co-owners of copyright in the work."[2]

---

[2]     Because Reid was an independent contractor, whether "Third World America" is a work for hire depends on whether it satisfies the terms of § 101(2). This petitioners concede it cannot do. Thus, CCNV is not the author of "Third World America" by virtue of the work for hire provisions of the Act. However, as the Court of Appeals made clear, CCNV nevertheless may be a joint author of the sculpture if, on remand, the District Court determines that CCNV and Reid prepared the work "with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U. S. C. § 101. In that case, CCNV and Reid would be co-owners of the copyright in the work. See § 201(a).

CCNV-II at 753. (Internal footnotes omitted.)

The first of two divisions among the circuits relevant to the case at bar appears in the later application of the "joint work" provision, defined in § 101 of the Copyright Act as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."

In the opinion filed for the D.C. Circuit Court by then-Circuit Judge Ruth Bader Ginsberg, the literal interpretation of the work for hire doctrine affirmed by the Supreme Court was described, along with a literal interpretation of the joint authorship doctrine, predicting that "with the substantial cutback of the work for hire doctrine under the 1976 Act, more cases of this genre can be expected to appear under the joint authorship rubric." Community for Creative Non-Violence v. Reid, 846 F.2d 1485, 1497 n17 (D.C. Cir, 1988) (hereinafter CCNV-I).[3]

In CCNV-I, the court considered the author's claim to sole authorship to be prominently undercut by fact that the Community for Creative Nonviolence (CCNV), the party that commissioned the work, (1) was the motivation behind the building of the statue, (2) conceived the resulting statue in starkly specific detail, and (3) directed enough of the artist's work (including overruling some of the artist's preferences) to ensure the statue met the commissioner's expectations and not just the artist's vision. The court explained that the commissioning party must contribute more than an abstract idea (which is not protectable by copyright). This occurred when agents of CCNV monitored the artist's progress and guided his expression, including overriding the artist in choosing the posture of the individuals portrayed in the statue (reclining, not sitting or standing)

---

[3] CCNV-II is the Supreme Court's affirmation of CCNV-I.

and the container for the family's belongings (shopping cart, not suitcases or bags). CCNV-I at 1496-7.

Justice Marshall, writing for an unanimous Supreme Court in CCNV-II, wrote approvingly of the application of the joint work doctrine proposed by the D.C. Circuit, based on the requirement that the parties intend "that their contributions be merged into inseparable or interdependent parts of a unitary whole" as stated in § 101. CCNV-II at 753. Yet some circuits have followed not the D.C. Circuit in CCNV-II but the Second Circuit in Childress v. Taylor, 945 F.2d 500, 507 (2d. Cir. 1991), by imputing an additional element, not found in the Copyright Act, to the joint work determination, specifically, a requirement that the participants must also intend to regard themselves as joint authors in order to remove from joint authorship claims persons whom the Second Circuit presumed Congress did not intend, such as book editors. Id. The legislative history makes no mention of an intent to be joint authors, reiterating that "the touchstone here is the intention, at the time the [copyrightable work is made] that the parts be absorbed or combined into an integrated unit." H.R. Rep. No. 94-147 at 120 (1976), reprinted at U.S.C.C.A.N. 5659, 5736. The First Circuit has yet to weigh in on whether the Congress or the Second Circuit and its followers is the proper party to strike the balance between would-be joint authors.

Copyright Validity

Defendant is not contesting the validity of Plaintiff's copyright in this opposition, but reserves the right to make such a claim later if appropriate.

Unauthorized copying

It is axiomatic that because one cannot infringe one's own copyright, co-owners cannot be liable to each other for copyright infringement. Authors of joint works share a tenancy in common as co-authors, holding an undivided interest in the work, including the right to exploit the work, subject only to the duty to account to the joint owners for profits. Weissman v. Freeman, 868 F.2d 1313, 1318 (2d. Cir, 1989). Joint owners are authorized to copy the work.

It is well settled copyright law that licensees also can be authorized to exploit copyrighted work, and that in granting the license, the grantor gives up his right to sue the licensee for infringement which occurs within the scope of the license, absent breach of a covenant or condition or so material a breach of the agreement as to warrant rescission.

To enhance a copyright holder's position relative to the recipient of a copyright transfer or license, Congress drafted 17 U.S.C. § 203(a)(5), providing an "inalienable authorial right to revoke a copyright transfer." N.Y. Times Co. v. Tasini, 533 U.S. 483, 496 n.3 (2001). This right to terminate an exclusive or non-exclusive grant of a transfer or license of copyright or any right thereunder may be executed in the five year period beginning thirty five years after the grant was executed. Section 301 of the Copyright Act provides for complete pre-emption of common law and state law.

Here is the second split among the circuits relevant to this case. The Ninth Circuit in Rano v. Sipa Press, Inc. held that state law providing for the termination at will of contracts of unspecified duration was pre-empted for copyright licenses by Section 203(a)(5) of the Copyright Act by action of Section 301. Rano v. Sipa Press, Inc. 987 F.2d 580, 585-6 (9th Cir. 1993). This decision has been criticized.

The Seventh Circuit reached the opposite conclusion: that the copyright statute does not prohibit the termination of a copyright license, including one of unspecified duration, before thirty five years from the license grant by operation of state law, but rather effects the intent of Congress to give copyright holders a second chance to market their works and safeguard them against unremunerative transfers, allowing an artist who granted rights for the life of the copyright or for some long period of time to terminate such a grant after 35 years in order to enter a more attractive bargain. Walthal v. Rusk, 172 F.3d 481, 484 (7th Cir., 1999).

The First Circuit has cited to the Walthal opinion as an example where state law remains essential to resolving the bulk of copyright contractual issues, given the silence of the Copyright Act on most contractual matters; "the rules governing contractual transfer of ownership have been left (for the most part) to state law." Invessys, Inc. v. McGraw-Hill, 369 F.3d 16, 19 (1st Cir. 2004).

Plaintiff correctly points out that the general rule in Massachusetts law also allows contracts of unspecified duration fairly to be construed as terminable at will by either party. Simons v. American Dry Ginger Ale, 335 Mass. 521, 524 (1954). Massachusetts law does not, however, state that perpetual licenses are contracts which "specified no duration" like the contract in Simons.

Rescission

It has long been settled Massachusetts law, however, that a contracting party seeking to void a contract for failure of consideration, mutual mistake, or even fraud must, in order to retrieve her consideration, return the consideration she received and so put the other party in the same position as before the contract. Conner v. Henderson, 15

Mass. 319, 322 (1818), <u>O'Shea v. Vaughn</u>, 201 Mass. 412, 422 (1908).  In <u>Fitch v. Ingalls</u>, 271 Mass. 121 (1930), the court made clear that failure to tender the consideration received precludes recovery on the ground of rescission.  Most recently, the Second Circuit held that the copyright holder "neither sued for rescission of the licenses nor alleged the breach of any covenant related to their grant. Accordingly, it cannot now recover for copyright infringement."  <u>TVT Records v. The Island Def Jam Recording Music Group</u>, 2005 U.S. App. LEXIS 11147, p. 27 (2d Cir., decided June 14, 2005).

<u>Preliminary Injunction</u>

Finally, the test for issuing a preliminary injunction requires proof of "each of the following: (1) the plaintiff has a likelihood of success on the merits of his claim; (2) the plaintiff does not have an adequate remedy at law such that it will suffer irreparable harm without the injunction; (3) this harm is greater than the injury the defendant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest."  <u>Concrete Machinery</u>, <u>supra</u>, 843 F.2d at 611.  The most important factor is the likelihood of success element; "irreparable harm is usually presumed if likelihood of success on the copyright claim has been shown," the balance of the hardships can be outweighed by a strong probability of success on the merits, and "the issue of public policy rarely is a genuine issue if the copyright owner has established a likelihood of success."  <u>Id</u>. at 612 (Emphasis added).

<u>LEGAL ANALYSIS</u>

<u>Copyright Infringement</u>

Copyright Ownership

arTees disputes Ms. McKennon's claim of sole ownership of the copyright on the grounds that arTees is a co-owner of the original painting because of the degree of artistic contributions made by servants and employees of arTees toward the final design which Ms. McKennon painted to their specifications. Ms. McKennon was an independent contractor, and arTees does not claim that the requirements of 17 U.S.C. 101(2) are met to render arTees the author of Ms. McKennon's contributions under the work for hire doctrine. However, these members of the arTees artistic staff were joint authors with Ms. McKennon due to the intention of the artists that their contributions be fixed into one painting, and, by virtue of the work for hire doctrine, arTees vicariously becomes the statutory author of its employees' contributions. These facts are analogous to <u>CCNV-I</u>, 846 F.2d at 1496-7. <u>CCNV-II</u>, 490 U.S. at 737, 751-3. Accordingly, arTees is co-owner of the copyright in the original artwork.

In addition, arTees asserts that the derivative works whose display Plaintiff complains of are, themselves, works of joint authorship, with Ms. McKennon and arTees' design and production staff co-authors as above, due to the intention to use Ms. McKennon's painting as a starting design, and, again by operation of the work for hire doctrine, arTees and Ms. McKennon are co-owners of any copyrights in the derivatives.

<u>Unauthorized Copying</u>

arTees asserts that any copying was at all times authorized by the express license granted by Ms. McKennon, which license, because it was fully paid-up, royalty-free, and perpetual, was not subject to cancellation as an indefinite contract.[4,5] Whether the oral

---

[4] Although not binding on this court, see <u>Furryrecords v. RealNetworks, Inc.</u>, 2002 U.S. Dist. LEXIS 16272 (S.D.N.Y 2002), which holds that a license which expressly provides it shall last "in perpetuity" does not lack a fixed or determinable duration, and, in fact,

agreement at bar had an express duration as arTees insists or did not as Ms. McKennon argues is a question of fact for trial.

The oral agreement between the parties was a completed bilateral contract with no executory elements.  It was not of the nature of an ongoing bilateral supply or installment contract where one party orders, the other party delivers, and the ordering party pays. Such an ongoing contract with executory obligations, if it specified no duration, could fairly be terminated by either party upon reasonable notice.  Simons, supra, 335 Mass. at 524.  This agreement at issue did not provide for successive performances while remaining silent on duration and so become eligible for gap filling by operation of M.G.L. Ch. 106, § 2-309(2).  Rather, by agreement of the parties, the express oral license at bar was a completed sale of a non-exclusive, royalty-free, perpetual license from Ms. McKennon to arTees.  Section 203(a)(5) of the Copyright Act empowers Ms. McKennon to terminate this license grant to arTees under the terms dictated by Congress.  Allowing Ms. McKennon to terminate this paid-up license at will on notice would deprive arTees of one of the very items for which they paid the agreed-upon price.

This entire copyright action stems from the dispute between Ms. McKennon and arTees over ownership of the original artwork.  arTees dealt with Ms. McKennon throughout their business relationship, and certainly with respect to the two designs at issue, virtually exclusively on the basis that it was purchasing not only the original, commissioned artwork but also the right to use those images in its business.  arTees discussed a two-tiered payment system (lesser price for rights only, greater price for

---

has a determinable duration because of the copyright holder's right to terminate the contract.  Accordingly, it is not terminable at will.  FurryRecords at 5.

[5] Of course, no copyright or patent license may lawfully extend beyond the duration of the statutory grant to the author or inventor, so forever is actually limited by statute.

originals and rights) with Ms. McKennon, but, with a singular exception not including the

art at issue here, chose to proceed only at the greater price because Ms. McKennon

proved unable to tell arTees for whom she made previously-crafted designs, who owned

the designs, and whether they were licensed to other parties. Purchasing the original

artwork allowed arTees to maintain possession of the paintings should they be needed

again after initial scanning and processing (as when a film was destroyed or a scan file

became corrupted or was lost due to computer or operator malfunction), and also so the

originals could not be shopped to the competition.

　　　If the bargains the parties believed they struck were so vastly different (purchase

of the original paintings and the right to use the designs perpetually, subject to Section

203(a)(5), on the one hand; and assuming a storage obligation for the convenience of the

artist and purchasing just rights to the designs for so long as the artist chose not to give

notice of termination, on the other) as to make out two completely different bargains,

then perhaps there was no valid contract at all and the proper action by this court at trial

will be rescission: return of the originals and rights to Ms. McKennon in exchange for all

moneys paid by arTees.[6]  The solution to the dispute over ownership is not the unilateral

termination of the license grant by Ms. McKennon, but an action for breach of contract or

for rescission of the contract, the latter of which would require that Ms. McKennon return

all consideration arTees provided.  Failure, as here, to tender the consideration paid

---

[6] The argument can also be made that in an agreement such as Ms. McKennon asserts
(payment by arTees for the artist to paint images arTees specifies to arTees' exacting
requirements, which paintings remain hers, and a license to use the painting which she
can revoke unilaterally on notice) is void because the consideration going to arTees is
illusory, being completely within the control, discretion and whim of Ms. McKennon.

precludes her eligibility to the equitable remedy of rescission.  O'Shea v. Vaughn, 201

Mass. 412, 422 (1909), Fitch v. Ingalls, 271 Mass. 121, 128-9 (1930).

 While predicating this business arrangement on an oral agreement between arTees

and Ms. McKennon may illustrate the naïveté of arTees' principals and prevents arTees

from asserting a claim to an exclusive license in Ms. McKennon's images, 17 U.S.C. §

204(a), arTees did pay for a royalty-free, perpetual license to use the artwork, was

granted an express license by Ms. McKennon, and, therefore, was authorized to display

the Rhododendron and Clownfish images on its web site.

 In addition, the December 23, 2004 letter from Ms. McKennon's counsel

purporting to terminate an implied license (which arTees is not claiming) recited certain

actions arTees was no longer authorized by Ms. McKennon to perform, but did not

rescind the grant of permission for arTees to display the artwork for promotional

purposes on the arTees web site, an activity previously authorized by Ms. McKennon's

grant of the express license.  (Memorandum in Support of Plaintiff's Motion for

Preliminary Injunction, p. 5, § II(C)(1); and 12/23/04 Letter, p. 2.)  The display of these

images to which Plaintiff objects, therefore, was at all times authorized.

 Plaintiff claims arTees' offering for sale garments incorporating Ms. McKennon's

artwork after termination of the license constitutes infringement.  Even were the

termination of the license at bar allowable, and the termination by letter in 2004 effective,

no such offers for sale were made; rather the presence of the images on the old web site

indicated the caliber of work arTees is capable of and has done in the past.

Preliminary Injunction

Because there are valid questions as to the ownership of the copyrights to the original artwork at issue and to the ownership of the copyrights to the derivatives which were, but are no longer, displayed on the arTees web site, and because arTees had a valid license from Ms. McKennon to use the artwork in its business, including the display on its web site, Ms. McKennon has not clearly established that she can satisfy either the ownership or unauthorized copying elements of her copyright claim. Accordingly, she has failed to demonstrate a likelihood of success on the merits.

Plaintiff's arguments regarding the three remaining requirements for a preliminary injunction are merely conclusions based on her assertion of a likelihood of success on the merits. Because she feels she has demonstrated that likelihood, she urges the court to presume the other elements.

Prevailing on the ownership or unauthorized copying elements of copyright infringement in this case is by no means certain, and, Defendant argues, unlikely. Therefore, the presumption in <u>Concrete Machinery</u>, 843 F.2d at 611-2, of irreparable harm upon otherwise demonstrating a likelihood of success is unwarranted. If the court agrees that Ms. McKennon's likelihood of success has, in fact, been successfully challenged, then it must consider this fact when weighing the balance of hardships. Ms McKennon is suffering no actual harm by arTees' actions. Where arTees has only a non-exclusive license in the artwork at issue, Ms. McKennon is, at law, free to exploit those paintings as she chooses. Of course, arTees owns and retains possession of the original paintings themselves, having paid to purchase them. Transfer of the physical paintings was and can be independent of transfer of the copyrights therein; the latter transfer would require a writing signed by Ms. McKennon, which arTees is not asserting. Whether as

18

sole author or co-author of a joint work, Ms. McKennon is entitled to continue exploiting her designs, subject to the duty to any co-authors. arTees' hardship lies in the loss of the ability to use rights and articles for which it paid the agreed price. Given its claims of ownership and valid license which need to be considered at trial, arTees can hardly be characterized as an infringer whose harm is lost profits from activity shown likely to be infringing, as Plaintiff alleges.

Finally, the presumption that public interest is best served by an injunction presumes the infringement whose proof has already undermined by the ownership and license claims of arTees. No misappropriation of skills, creativity, or resources is in play in the case at bar; arTees is merely seeking to continue exercising the rights for which it paid good consideration in purchasing the paid-up, royalty-free, perpetual license from Ms. McKennon. No public interest is served by preventing arTees from using what Ms. McKennon freely sold to arTees – at least until her reversionary right ripens under 17 U.S.C. § 203(a)(5) and she is entitled to terminate this license grant, or a court grants the equitable relief of rescission.

<u>CONCLUSION</u>

This infringement motion and the underlying copyright action are a result of a dispute between the parties over ownership of the original artwork. When arTees refused to accept Ms. McKennon's characterization of the transactions conducted more than three years of commissioning paintings, Ms. McKennon threatened and has not brought copyright infringement via a questionable license revocation to strong arm arTees into returning the artwork it purchased. arTees continues to resist. It would be inequitable if

Ms McKennon were rewarded with an injunction or impoundment at this stage for these abusive activities.

An injunction against arTees making and selling garments incorporating the two designs at bar and displaying these images on its web site would be inappropriate, given arTees' claims to ownership and license from Ms. McKennon.  Impoundment of the original paintings, likewise, would be improper as Ms. McKennon sold the paintings outright to arTees, along with the paid-up license.  Impounding garments is impossible and unnecessary because arTees prints and embroiders to order and maintains no inventory of garments printed with any image.

Accordingly, Defendant, arTees Island Designs, LLC, respectfully requests that Plaintiff's motion be denied in its entirety.

July 20, 2005

Attorney for arTees Island Designs, LLC.,

/S/ David W. Skinner
David W. Skinner, BBO # 654993
257 Blue Hills Parkway
Milton, MA 02186-1542
(617) 322-1607

CERTIFICATE OF SERVICE - I hereby certify that a true copy of the above document was served upon the attorney of record for Plaintiff, Gayle McKennon, by electronic filing through the CM/ECF system of the US District Court for the District of Massachusetts on July 20, 2005.

/S/ David W. Skinner
David W. Skinner

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GAYLE MCKENNON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 05-CV-11416 |
| | ) | |
| ARTEES ISLAND DESIGNS, LLC, | ) | |
| Defendant | ) | |
| | ) | |

## AFFIDAVIT OF STEPHEN H. GAYNER

I, Stephen H. Gayner, being duly sworn, do hereby depose and state as follows:

1. I have personal knowledge of the matters set forth in this affidavit, except for any matters known to me on information and belief, and, as to those, I believe them to be true and accurate.

2. I submit this affidavit in opposition to Plaintiff's Motion for Preliminary Injunction.

3. I am a member and manager of arTees Island Designs, LLC, a Massachusetts Limited Liability Company I formed with my fellow members November 6, 2002.

4. We met Gayle McKennon sometime in 2001. She had done some work for Soft as a Grape and one of our principals knew her from there. She showed us her portfolio and we felt there was some work she could do for us. We were interested in having an artist that could paint to spec, since we were trying to sell custom-developed images to museums, zoos, aquariums and the like.

5. During our early meetings, we agreed on a price for art developed to our specs. That price included the purchase of the original art and the perpetual right to reproduce it and derivations in print and embroidery, on tee shirts and other garments. At a later point in

time, we agreed on a price for pre-existing artwork – work that Gayle had already created and had not done to our specifications. The price for pre-existing artwork did not include the purchase of the original, only the rights to reproduce the image and derivations. For work done to spec, prices varied from $100 for simple one or two color images to $300 for complex, multi-color images. For pre-existing art work, the price was $100.

6. We agreed that we should have a written contract, but creating that contract took second seat to starting and running the new business. Gayle provided us with a contract sample that she said she had signed at Cuffy's (another screen printer on the Cape). Interestingly, that contract defined her work as "Work Made for Hire" and gave her no rights or interest in the work. Gayle's only request to us was that she could get attribution as the artist. We agreed that she could sign all printed images produced by us.  We have put Gayle's signature on every image of hers that we ever printed.

7. It became apparent in working with Gayle that, on many pre-existing images that she showed us, she was not sure for whom she had created the image, or when, or exactly who owned what rights. We were concerned about the possibility that we would be buying an image that someone else held the exclusive right to print or do something with. Gayle told arTees she had worked for Claire Murray and we didn't want to get tangled in any situation with a heavyweight like that. As a consequence, we only bought one image, Faded Sailboats, which was not specifically commissioned by arTees.

8. All of the work done by Gayle was done to exacting specifications provided by arTees. I downloaded many images that Gayle was given as reference material. Leslie (another arTees principal) told her what parts of each image we liked and what parts we didn't like. Gayle provided sketches which were analyzed by Leslie and our in-house artist. The

sketches were critiqued by Leslie, and Gayle would then do subsequent sketches, gradually filling in texture and color, reviewing and modifying the results at arTees' direction in an iterative process. I was present in some, but not all, meetings with Gayle, although I had little or no direct input on the details of the images.

9. For the Clown Fish image, for example, we provided information on the brightness of the colors to be used, the number of fish in the image and the background in which the fish must be displayed. One of our sales reps called Gayle to give her additional, specific input. Details had to be correct as we were trying to sell to aquariums that cared about correct details in the images they sold.

10. An early lesson we learned illustrates our need for accuracy in artwork: we commissioned an artist to draw panda bears, intending to sell them to the National Zoo in Washington, DC. The completed image was printed and sent to the zoo, who said they only bought images that were exact images of the bears they had at the zoo, because the Chinese government required exact "copies" of their bears. Having learned to be specific with our instructions, we were precise and exacting with Gayle.

11. All of Gayle's invoices were paid upon presentation. Each invoice was written to arTees and a description of the transaction was included in a section captioned "For."  This section identified the specific piece of art sold in that transaction and sometimes included a further description or purpose for the commission. In the "For" paragraph, some of the invoices were marked, "Art services rendered." Some also said "for use on screened garments and other related material." One said, "For Special order." One said "Remake of old idea using all new artwork."

12. The Faded Sailboat image, and only that image, said "Usage of art," which was clearly different from all the other invoices, and in which instance Gayle sold arTees just the right to use that image and we returned the painting to her.

13. The other invoices were, in fact as Gayle knows, bills presented to arTees for the purchase of the originals and for the use of the images. Many of the invoices said "For art services rendered" after identifying the piece sold, and made no mention of the uses it could be put to. If she wasn't selling the original, what was she selling?

14. Every invoice was copied and given to Gayle.

15. For every image, a copy of the computer file created in the scanning process was given to Gayle. Many times we had to replace the electronic images because she lost them.

16. Regarding Gayle's attempt to reclaim her originals: It was clear at the time and clear to me now that in the phone call or meeting a few days before June 18, Gayle was asking to use (borrow) her originals to display in an art show. I told her that Leslie's brother had just died and that Leslie was in no state of mind to discuss it, but that, in general, we didn't feel comfortable with loaning out artwork.

17. In the second call, on June 18th, we told her that we were hesitant, since we had experience with other artists who did not return paid-for art that had been borrowed. It was then, for the first time, that Gayle said that we were only "holding" the art until she had room to store it. She either said or implied that she was only selling the rights and not the original art. Prior to that date, she had never said anything about selling anything less than the originals and the rights (with the exception of Faded Sailboats).

18. In the actual meeting on June 21st, Gayle again stated that she did not sell us the originals and that we were only holding them for her until she could obtain storage space. This is

patently absurd, as a) until the spring of 2004, arTees did not have any place to store artwork – it was just kept in random drawers and stacks and b) Gayle had a studio with hundreds or thousands of pieces of art and could certainly fit another 42 pieces into the room. Finally, we gave Gayle a check for the art she had delivered to us at that meeting, stating that we would only deal on an outright purchase basis and she took the check. (It appears that it was never cashed, however. I have some vague memory of her lawyer mentioning a replacement check in passing, since the original had been lost.)

19. We were so upset at the meeting and with the conduct of Gayle's friend, Paul, whom she brought with her June 21st that we called the Barnstable police department and spoke with a detective.

20. The deal we made with Gayle included the purchase of the artwork and the rights to use the artwork in the business forever. We would not have made the deal she claims she remembers. We would not have paid her the price we paid just for the rights; rather, we would have discounted the price as we did with "Fading Sailboats."

21. arTees retains no stock of any artist's images already printed or embroidered on garments. Rather, arTees maintains some limited inventory of blank apparel, orders specialty items as requested, and prints to order. arTees has no inventory of garments bearing images derived from Rhododendron or Clown Fish.

22. Some images on our web site are there just to show what we can do, and are not for sale. Signed under the pains and penalties of perjury this 20th day of July, 2005.

Stephen H. Gayner

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GAYLE MCKENNON, | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ARTEES ISLAND DESIGNS, LLC, | ) |
| Defendant | ) |
|  | ) |

Civil Action No.: 05-CV-11416

## AFFIDAVIT OF LESLIE A. GAYNER

Regarding specifications supplied to Gayle McKennon for painting images

1. Gayle was given very specific instructions for each image she was asked to paint for us. We were targeting custom work for museums and aquariums that have exacting standards for historical and contextual accuracy of the images. Gayle was told the colors to use, the size of the image, the textures we wanted to portray, and the background color. She was given tee shirts and color swatches to use as color guides, she would bring in color proposals that I would chose from after consulting with our artists and our printer.

2. She knew that our customers were very picky and that we had to provide a preliminary sketch to the customer. We would instruct Gayle not to spend more than 20 minutes or so developing the sketch.

3. The ideas of what to paint were not hers, nor were most of the details related to color and texture, placement of objects within the painting (perspective), or background. Every painting started with a sketch that I would critique and review with our graphics person and the customer. Gayle then created another version, hopefully closer to what I wanted. I would critique again and eventually we arrived at what I asked for.

1

4.  As an example, in the case of the Grand Canyon, she did not do what I wanted and I had to have our separator make changes before we could separate the image.  We were frustrated because she didn't meet the deadline and she had altered the image in such a way that forced us to pay the separator to fix the image that she had ruined.  We told her that what we were paying should be deducted from her art charge – we couldn't salvage the art otherwise.

5.  As another example, on the Magnolia, the background was completely wrong and I had to pay the separator make correct it.

6.  For the Clown Fish, she was given images of clown fish, descriptions of the environment they live in, the desired colors and brightness for the fish, the number of fish desired, the type of anemone they live among and other fine details. One of our sales reps called her to give her more information, explaining that the aquariums and other potential customers had to have it exactly right.  Our rep spent 30 minutes on the phone with her going over the specs of the image, describing in great detail the environment these fish live in.

7.  For the Bear in the Tree image, she knew it was going to be embroidered and she was given the specific thread colors we were trying to match. She was given images as a reference from one of our photography books as examples of the "cuteness" desired.  We asked her to paint so that it looked like "paint-by-numbers" so the digitizer (the artist that creates the file) could easily recognize the change in colors in the image.

8.  On many other images, I remember our graphic artist and Steve (another arTees principal) pulling dozens of images and specs off the Internet to use as examples of color, layout and environment, particularly for zoo animals and sea animals. We gave her books of images from our library and books that we bought for those specific commissions.  We

borrowed books on several occasions from the museums that we were doing the work for to use the information/images in the art in their collections.

9.  Another good example of specifications was the Bromeliad, done for a customer in Hawaii. The customer is a breeder of these plants and actually created the one we were doing for embroidery.  The size, color, general posture and orientation of the plant, leaf placement, and, more than anything, colors were specified in great detail. Gayle did a good job, but it was more paint-by-numbers and less creative genius that she supplied. She did several iterations, each of which was critiqued by us <u>and the customer</u>, before completing the project.

<u>Regarding purchase of originals and rights to use the images</u>

10. From the start, it was clear that Gayle was selling us original custom painting and the rights to use the images on tees and other garments, at trade shows, and elsewhere in our business forever. The only thing she ever asked for was the right to sign her paintings because, she said, that had been denied her by previous employers – Soft as a Grape (another Cape Cod printer) was specifically mentioned. We agreed to do that and have always put her name on her images. She never asked for anything else.

11. As a sample for the contract she wanted to have with us, she gave us a contract she had signed with Cuffy's. That contract gave her no rights at all to any images she developed while she was an independent contracted for them. She wasn't asking us for any different terms. We agreed on $300 for full watercolor images and less, based on delivery time and simplicity, for other images (pencil sketches like Saddlebred Horses or children's images like the Kite and the Flower, for example). Exact prices were determined at the time of commissioning for each piece.

12. When she brought it up, we agreed that she could show us paintings that she had already created. She had already told us that Claire Murray was a customer and that she had done work for other screen printing companies. Her lack of certainty on whom she created the images for or what rights she sold made us wary.

13. She subsequently showed us the Faded Sailboats image, which we liked. We told her what our agreement was with other artists and she agreed to the price of $100 for reproduction rights only, the original to be returned to Gayle, which it was.

14. Over the course of the relationship with Gayle, we bought just that one already-existing image. It was also the only instance when we purchased just the rights from her and not the original piece as well.

15. Gayle knew she was being paid more than our other artists and we discussed with her that we would be changing the price in the future to be more in line with standards on the Cape, her frequent delivery problems and other issues.

16. One reason that arTees was willing to pay Gayle a premium for her art, relative to other artists, was because we were buying the originals and the rights. We pay far less for art that does not have an original – computer graphic art, for example. In addition, with Gayle, getting the originals was the only way we could feel comfortable that the art would not be sold to anyone else.

17. arTees has only bought original art outright and only buys perpetual licenses. We have rejected opportunities to work with other artists simply because they wanted to put a limit on the time we can use the images. We have rejected artists who did not want to sell originals. The only time we buy only rights is when the original exists solely in computer form and there is no real "original" to be had.

18. During the three-plus years we worked with Gayle, we bought about 42 original paintings with the rights forever, and just the rights but not the original for 1 (Fading Sailboat), for a total of about $10,300.  We purchased the original and the rights to Clown Fish and Rhododendron for $300 each on 12/15/03 and 7/23/02, respectively.

19. We have printed none of the designs based on her art since receiving the 12/04 letter.

Regarding her attempt to retrieve "her" artwork

20. Gayle came in to show me one of her sketches that she was working on and mentioned that she was going to be exhibiting in an art show. I didn't know what show or where it was, but wished her the best at the show. Later, our graphics person mentioned to me that Gayle wanted to bring her art to the show. It wasn't until that discussion that the point was made to me that she wanted some pieces that she did for us.

21. When she called again, I said we would need to discuss which pieces she wanted to borrow for the show, because not everything we had bought had been scanned or separated at that point. I was concerned knowing that it was likely that any lost art would not be recreated due to her lack of time management skills.  I reiterated that we would have to discuss the pieces that she wanted to take to the show – we were concerned she would lose the art or that it would get destroyed. That seemed to happen to her a lot.

22. When she came in to drop off the Manatee image, she had a box and she asked for her art work. I told her that we had discussed this on the phone, that I was still trying to recover from my brother's death, and that I needed to think more about it and discuss it with my co-owners. We had lost artwork in the past and it's an expensive error to make again.

23. We didn't feel comfortable loaning her the artwork and we would have to discuss which pieces she wanted to take to the show.  It was only at this point that she claimed she had

not sold us the originals that we were just storing the images for her until she had a place to put her art. I told her that was not our deal and that we would only deal with her if we owned the originals.

Regarding her assertion that we were "storing" her art

24. Gayle has a studio where all of her art is stored. She has thousands of pieces of paper in the room and there is no way she can say she didn't have room to store the images. Second, we didn't have art storage cabinets until about a year ago (early spring of 2004), so we couldn't have offered to store them in any better condition than Gayle could have kept them. Third, we would never have taken on the responsibility of storing someone else's artwork. Our policy is, and always has been, to keep the artwork for as short a time as possible and give it back to the artist, museum or customer as soon as the scans/separations are completed.

25. While we have to accept the possibility we might suffer a catastrophic loss to our own art or any other asset, we're extremely careful to minimize any obligation to hold anyone else's art – because it's usually valuable and irreplaceable.

Signed under the pains and penalties of perjury this 20th day of July, 2005.

Leslie A. Gayner